CINDY M. SMITH,
        Plaintiff,

        vs.

COMMISSIONER OF
SOCIAL SECURITY,
        Defendant.

Case No. 1:17-cv-0049
Black, J.
Litkovitz, M.J.

**REPORT AND
RECOMMENDATION**

Plaintiff Cindy Smith brings this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3)

for judicial review of the final decision of the Commissioner of Social Security

("Commissioner") denying plaintiff's application for supplemental security income ("SSI").

This matter is before the Court on plaintiff's Statement of Errors (Doc. 13), the Commissioner's

response in opposition (Doc. 17), and plaintiff's reply (Doc. 20).

## I.  Procedural Background

Plaintiff filed her application for SSI in February 2012 alleging disability since February

28, 2012.[1]  Plaintiff alleges disability due to "1. Bipolar disorder, ptsd, panic disorder, bpd 2.

Bipolar Disorder with psychotic features 3. Post Traumatic Stress Disorder 4. Panic Disorder

without Agoraphobia 5. Borderline Personality Disorder 6. Low cognitive functioning 7. History

of physical and sexual abuse 8. Fear of abandonment 9. Suicide attempts/self mutilation

behaviors 10. Anger & Rage 11. Acid reflux and migraines." (Tr. 471).  After initial

administrative denials of her claim, plaintiff was afforded a hearing before administrative law

---

[1] Plaintiff originally filed applications for both SSI and disability insurance benefits (DIB) and alleged a disability onset date of February 3, 2008. (Tr. 209).  She later amended the alleged onset date and the DIB claim was dismissed at her request. (Tr. 21, 209).

judge (ALJ) Kristen King on November 21, 2013, at which vocational expert (VE) Howard Caston testified. (Tr. 89-120). On April 7, 2014, ALJ King issued a decision denying plaintiff's SSI application. (Tr. 206-19). On October 29, 2015, the Appeals Council issued an order vacating the ALJ's decision and remanding the case for resolution of two issues: (1) the hearing decision did not contain an evaluation of the opinion of treating psychiatrist Dr. Alexander A. Weech, Jr., M.D. dated August 2012, in which he stated that he treated plaintiff "from December 2011 through July 2012 for bipolar disorder, posttraumatic stress disorder, panic disorder, and borderline personality disorder" and plaintiff "has a very poor ability to tolerate stress at work as well as difficulty working with others and getting along with supervisors"; and (2) the ALJ's decision did not address or weigh the opinion of state agency psychological consultant Cynthia Waggoner, Psy.D., who "opined that the claimant is limited to simple routine tasks in an environment that has flexible production standards and schedules and is able to interact superficially with the general public, co-workers, and supervisors ([Tr. 151-63, 165-77])." (Tr. 226-27). On remand, the ALJ was ordered to (1) "[g]ive further consideration to the claimant's maximum residual functional capacity [RFC] during the entire period at issue and provide rationale with specific references to evidence of record in support of assessed limitations" and in so doing, evaluate the medical opinion evidence and explain the weight given to the opinion evidence; and (2) obtain supplemental VE evidence to clarify the effect of the assessed limitations on plaintiff's occupational base. (*Id.*).

An ALJ hearing was held on remand before ALJ King on February 18, 2016. (Tr. 43-88). Plaintiff was represented at the hearing by a non-attorney representative. Plaintiff and VE George Colemen, III testified at the hearing. The ALJ issued a decision on April 14, 2016, denying plaintiff's application for SSI benefits. (Tr. 17-35). Plaintiff's request for review by the

2

Appeals Council was denied, making the decision of the ALJ the final administrative decision of the Commissioner.

## II. Analysis

### A. Legal Framework for Disability Determinations

To qualify for disability benefits, a claimant must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 1382c(a)(3)(A). The impairment must render the claimant unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy. 42 U.S.C. § 1382c(a)(3)(B).

Regulations promulgated by the Commissioner establish a five-step sequential evaluation process for disability determinations:

> 1) If the claimant is doing substantial gainful activity, the claimant is not disabled.
>
> 2) If the claimant does not have a severe medically determinable physical or mental impairment – *i.e.*, an impairment that significantly limits his or her physical or mental ability to do basic work activities – the claimant is not disabled.
>
> 3) If the claimant has a severe impairment(s) that meets or equals one of the listings in Appendix 1 to Subpart P of the regulations and meets the duration requirement, the claimant is disabled.
>
> 4) If the claimant's impairment does not prevent him or her from doing his or her past relevant work, the claimant is not disabled.
>
> 5) If the claimant can make an adjustment to other work, the claimant is not disabled. If the claimant cannot make an adjustment to other work, the claimant is disabled.

*Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009) (citing 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 404.1520(b)-(g)). The claimant has the burden of proof at the first four

steps of the sequential evaluation process. *Id.*; *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 548 (6th Cir. 2004). Once the claimant establishes a prima facie case by showing an inability to perform the relevant previous employment, the burden shifts to the Commissioner to show that the claimant can perform other substantial gainful employment and that such employment exists in the national economy. *Rabbers*, 582 F.3d at 652; *Harmon v. Apfel*, 168 F.3d 289, 291 (6th Cir. 1999).

### B. The Administrative Law Judge's Findings

The ALJ applied the sequential evaluation process and made the following findings of fact and conclusions of law:

1. The [plaintiff] has not engaged in substantial gainful activity since February 28, 2012, the protective filing date of the current Social Security income application and the alleged onset date (20 CFR 416.971 *et seq.*).

2. The [plaintiff] has the following severe impairments: obesity; diabetes mellitus; depression; bipolar disorder; anxiety; post-traumatic stress disorder; borderline personality disorder; and history of drug abuse (20 CFR 416.920(c)).

3. The [plaintiff] does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4. After careful consideration of the entire record, the [ALJ] finds that the [plaintiff] has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except the [plaintiff] can never climb ladders, ropes or scaffolds; must avoid all use of dangerous machinery; and must avoid all exposure to unprotected heights. The [plaintiff] is limited to simple tasks, which are defined as tasks consistent with unskilled work as defined in the DOT. The [plaintiff] is able to perform goal-oriented work, but no constant production rate pace work, such as an automated assembly line. The [plaintiff] is limited to jobs in which changes occur no more than approximately fifteen percent of the workday. The [plaintiff] can interact with the public no more than approximately fifteen percent of the workday, but no transactional interactions, such as sales or negotiations. The [plaintiff] is limited to only occasional interaction with coworkers or supervisors, but with no tandem tasks.

5. The [plaintiff] is unable to perform any past relevant work (20 CFR 416.965).

4

6. The [plaintiff] was born [in] . . . 1982 and was 29 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 416.963).

7. The [plaintiff] has at least a high school education and is able to communicate in English (20 CFR 416.964).

8. Transferability of job skills is not an issue in this case because the [plaintiff's] past relevant work is unskilled (20 CFR 416.968).

9. Considering the [plaintiff]'s age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the [plaintiff] can perform (20 CFR 416.969, and 416.969(a)).[2]

11. The [plaintiff] has not been under a disability, as defined in the Social Security Act, from February 28, 2012, through the date of [the ALJ's] decision (20 CFR 416.920(g)).

(Tr. 23-35).

### C. Judicial Standard of Review

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g) and involves a twofold inquiry: (1) whether the findings of the ALJ are supported by substantial evidence, and (2) whether the ALJ applied the correct legal standards. *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see also Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007).

The Commissioner's findings must stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*,

---

[2] The ALJ relied on the VE's testimony to find that plaintiff would be able to perform the requirements of representative light, unskilled occupations such as Motel/Hotel Housekeeper (1,240 jobs regionally and 224,260 jobs nationally), Mail Room Worker (310 jobs regionally and 24,770 jobs nationally), Hand Packager (400 jobs regionally and 52,160 jobs nationally), and Routing Clerk (594 jobs regionally and 49,580 jobs nationally). (Tr. 34). The ALJ also relied on the VE's testimony to find that plaintiff would be able to perform the requirements of representative sedentary, unskilled occupations such as Document Preparer (148 jobs regionally and 21,770 jobs nationally), Cutter/Paster (147 jobs regionally and 21,210 jobs nationally), and Tube Operator/Mail (320 jobs regionally and 82,350 jobs nationally). (*Id.*).

402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance. . . ." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). In deciding whether the Commissioner's findings are supported by substantial evidence, the Court considers the record as a whole. *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

The Court must also determine whether the ALJ applied the correct legal standards in the disability determination. Even if substantial evidence supports the ALJ's conclusion that the plaintiff is not disabled, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Rabbers,* 582 F.3d at 651 (quoting *Bowen,* 478 F.3d at 746). *See also Wilson*, 378 F.3d at 545-46 (reversal required even though ALJ's decision was otherwise supported by substantial evidence where ALJ failed to give good reasons for not giving weight to treating physician's opinion, thereby violating the agency's own regulations).

### D. Specific Errors

On appeal, plaintiff argues that the ALJ erred by: (1) failing to properly weigh the medical opinion evidence, and (2) failing to find that plaintiff did not meet/equal Listing 12.04.

### 1. Medical evidence

Plaintiff was originally referred to Centerpoint Health (Centerpoint)[3] in May 2010 by her primary care physician. She underwent a diagnostic assessment and an individual service plan was developed. (Tr. 623-36). Her current medications included Seroquel, Ambien, Lexapro,

---

[3] The agency's name changed during plaintiff's treatment from Centerpoint to the Talbert House.

and Busbar. (Tr. 626). She reported a prior suicide attempt by cutting in 2006, after which she was hospitalized for 13 days. (Tr. 627). She was jailed twice between 2004-2006 for violent behavior, and the current risk of violence toward others was assessed as moderate. She denied friendships and stated her only friend was in Indiana. (Tr. 628). She reported having over 30 jobs in the past, none of which lasted over three months. The diagnostic impressions were mood disorder NOS, cocaine dependence-sustained full remission, and borderline personality disorder. (Tr. 630).

### i. Mary Lynne Calkins, LISW-S

Plaintiff returned to Centerpoint in August 2011, at which time licensed social worker Mary Lynne Calkins, LISW-S, completed a Diagnostic Assessment Form. (Tr. 792-99). Plaintiff reported she was depressed, she had suicidal thoughts with no plan and crying spells daily, she felt hopeless, helpless, anxious and nervous, she lacked motivation and energy, she was paranoid, and she did not associate with people except her boyfriend and her children. (Tr. 792). She had a history of mood changes and depressive symptoms since age 16 or 17. She reported periods of impulsivity and feeling as if her mind will not stop. She was a victim of rape and she continued to have nightmares about the assault. She had difficulty trusting other people, especially men, and feelings of anxiety in unfamiliar places. She was hypervigilant and had a short temper. On mental status examination, her behavior was cooperative but guarded, impulse control was fair, facial expression was attentive/sad, affect was blunted, judgment was fair, mood was depressed/anxious, and paranoid ideation/mild suicide ideation and perceptual disturbances/auditory hallucinations were reported. (Tr. 792).

Plaintiff had counseling sessions with Ms. Calkins on an approximately monthly basis starting in October 2011. (Tr. 792-810, 829-53, 1343-1435). Ms. Calkins completed an Adult Diagnostic Assessment Update on June 2, 2015 that was co-signed by plaintiff's treating psychiatrist at Centerpoint at the time, Dr. Cory Pelnick, M.D. (Tr. 1299-1342). Plaintiff also treated with several other psychiatrists at Centerpoint. The psychiatrists saw plaintiff approximately once a month for management of her medications.

### ii. Dr. Andrew Weech, M.D.

### a. Treatment notes

Plaintiff treated with Dr. Weech at Centerpoint between December 2011 and July 2012. At the first office visit, plaintiff reported she had suicidal ideation but denied a plan. She reported she was a rape victim. She had a history of violent behavior, she was very impatient and hypervigilant, and she complained of nightmares and flashbacks. She felt ready to hit people when they came up to her suddenly and she believed people would hurt or harm her. She complained of a lot of anxiety and described two to three incidents each week where her heart would pound for one to two hours. She heard voices. Dr. Weech prescribed medications which included Seroquel, Depakote, and Ambien. (Tr. 818-19).

When Dr. Weech next saw plaintiff on February 7, 2012, she had stopped her medications due to weight gain and because she needed to be alert for her baby. She reported that she continued to feel depressed, was constantly yelling at her boyfriend, and her anger was increasing. Dr. Weech adjusted her medications and added Lexapro 20 mg. (Tr. 816-7). On March 6, 2012, plaintiff reported to Dr. Weech she was not better, she was "so mean" and was always yelling and shouting at her boyfriend, she was having suicidal ideation, and she was

crying a lot. (Tr. 814-15). She teared up when telling him she had no family support, she lacked energy, she needed something to calm her down, and her past – "being raped, etc." – was making her this way. (Tr. 814). On April 10, 2012, plaintiff reported that her depression had persisted at about the same level and fluctuated from mild to severe and she had some passive suicidal ideation as well as some anxiety. (Tr. 812-13). In July 2012, plaintiff reported that she "signed 2 of my kids away. I've been yelling at them when they misbehave." (Tr. 850-51). She had kept her one year old daughter. Her depression was still bad. She had panic attacks several times a week and heard voices. She reported drinking two liters of Mountain Dew a day, which Dr. Weech noted could increase anxiety. He noted she was adhering to the medication plan as prescribed "most of the time." Dr. Weech decreased some medications, increased others and added Risperdal. He continued Buspar and Lexapro. (Tr. 851). On July 24, 2012, plaintiff reported to Dr. Weech that she still had a lot of anger, especially toward her boyfriend, she worried a lot, she was still depressed, and she still heard voices and felt that people were trying to break in. She had given her children up except for her one year old because she felt too impatient. She reported having increased energy for two hours possibly once or twice a week. Dr. Weech increased some medications and continued others. (Tr. 845-46). In September 2012, plaintiff reported that her anxiety seemed worse, including her panic attacks which occurred twice a week and lasted a couple of hours. She felt jitters and needed to calm down, she had crying spells, and she was depressed about her children being away. (Tr. 840). She had gained 80 pounds over a period of some months and currently weighed 264 pounds. She was not hearing voices since her Risperdal had been increased and was not as anger prone. Dr. Weech added Topomax to her medication regimen. (Tr. 840-41).

### b. Dr. Weech's August 4, 2012 assessment

Dr. Weech completed a questionnaire at the request of the state agency on August 4, 2012. (Tr. 822). He noted he had first seen plaintiff on December 6, 2011 and had last seen her on July 24, 2012. Her diagnoses were bipolar disorder, most recent episode depressed, severe, with psychotic features; PTSD; panic disorder without agoraphobia; and borderline personality disorder. Dr. Weech described plaintiff's significant clinical mental status abnormalities as depression with suicidal ideation at times; history of cutting wrists and hospitalization in 2006; history of violence which including hitting a girl with a phone in 2005 and hitting her boyfriend recently when she was angry; flashbacks and nightmares of past abuse; anxiety with panic attacks at least twice a week; hearing voices occasionally; and crying spells daily. (Tr. 823). He opined that plaintiff has difficulty with concentration and cannot sit through a movie, difficulty with completing tasks, and difficulty making it to appointments; she does not tolerate frustration well and gets angry easily and yells; she has to make lists to remember things; and she has very poor frustration tolerance. She had significant restriction of daily activities, which consisted of bathing daily currently, although she had not been doing so for a while when severely depressed; cooking just one meal a day and snacking otherwise; and she could manage and count money. He reported that plaintiff's interests were limited to doing word searches but she would get annoyed and bored with that activity; she was afraid to be around people and so she had limited interests and motivation to go out; and she had gained a lot of weight and had little motivation to cook and eat healthily. Dr. Weech reported that plaintiff had a lot of problems with supervisors at work and would walk out when angry, which caused her to lose several jobs; she did not get along with co-workers; she had only two to three friends; she did better when working alone; and

she had a bad experience of working at a place that was robbed. Dr. Weech reported that when plaintiff gave up two of her children she had an "episode of decompensation (crying)" and that she fought with her boyfriend frequently, but Dr. Weech reported she did not have frequent episodes that required hospitalization since 2006. Dr. Weech noted that by plaintiff's report, she had experienced symptoms for 16 years consisting of nightmares, flashbacks, voices, panic attacks, depression, suicidal thoughts with some ability to resist impulses, and inappropriate affect, i.e., "laughs when upset or stressed to cover up feelings." (Tr. 824). Dr. Weech reported that plaintiff complained that her medication was not working for her. He reported that her medications had been changed frequently but she was still having trouble with depression, anxiety, and angry outbursts, fighting with her boyfriend, and difficulty interacting with others. He indicated that she was compliant with her medication and her appointments most of the time but that lack of transportation could be a barrier. He also reported that she had difficulty working with others and getting along with supervisors, she was fearful around others and could not handle crowds, and she had problems getting along with her boyfriend.

### iii. Dr. Swanson

Plaintiff saw Dr. Swanson, a psychiatrist at Centerpoint, twice in October 2012. (Tr. 834-838). On October 17, 2012, Dr. Swanson recommended a major overhaul of plaintiff's medications, which he found to be "overly extensive and redundant." (Tr. 838). He wrote that plaintiff's symptoms were "worsening or not remitting despite adherence." (Id.). He increased the Topamax dose. (Tr. 838). On October 31, 2012, plaintiff reported that her mood was "ok," she had conflicts with her boyfriend, and she said in a therapy session earlier in the month that she wished her boyfriend's mother would die and "I meant it." (Tr. 834). Plaintiff was oriented

times four; she was pleasant and lethargic, noting she was not used to being up as early as 9:30 a.m.; and all other mental status findings were negative. The plan was to continue plaintiff on her current medications until Dr. Swanson's successor could simplify her medication regimen. (Tr. 835).

### iv. *Dr. Michael Wilson, Jr.*

### a. *Treatment records*

Plaintiff treated with Dr. Wilson from the end of 2012 through the end of 2014. His handwritten treatment notes are only partially legible. On December 31, 2012, he diagnosed plaintiff as bipolar and indicated that he was changing plaintiff's medications due to lack of efficacy or insufficient improvement on the current regimen. (Tr. 831-32). He increased Lexapro and decreased other medications. He recommended that plaintiff decrease her caffeine intake. Dr. Wilson saw plaintiff twice in April 2013. (Tr. 897-99, 1532-33). On April 25, plaintiff reported sleep problems. (Tr. 897). The mental status examination findings were normal. Dr. Wilson changed her medications due to "Lack of efficacy or insufficient improvement on current drug," including by increasing the dose of Trazadone. (Tr. 899). On May 23, 2013, Dr. Wilson noted that plaintiff was drinking "2L Mountain Dew" each day. (Tr. 892). She reported nervousness, depression and sleep problems. (Tr. 893). Her mental status examination findings were normal. Dr. Wilson again changed her drug regimen due to lack of efficacy or insufficient improvement. (Tr. 895).

Plaintiff had two intervening visits with Dr. David Berkowitz, M.D., while treating with Dr. Wilson. On June 20, 2013, her chief complaints were "depression and anxiety." (Tr. 888-91). She reported she had been "up and down," the medication Invega had helped with "voices"

but not depression, and Lexapro had been helpful in the past. She also complained of sleep problems. (Tr. 889). Her mental status examination findings were normal except that her mood and affect were "anxious, mildly flattened." (Tr. 890). Dr. Berkowitz changed plaintiff's medications due to symptoms worsening or not remitting. (Tr. 891). He increased Klonopin and indicated he would consider adding an antidepressant or lithium. On July 19, 2013, plaintiff again complained of depression and anxiety. (Tr. 884-87). Her anxiety was better after increases in her medication but she had depression with crying spells because of her children, she was angry and irritable and had hit her boyfriend, and she had sleep problems. (Tr. 884-885). On mental status examination, her mood/affect were "anxious, mildly flattened." (Tr. 886). The notes reflect she had "racing thoughts" and heard "voices again." (Tr. 886).

Plaintiff resumed seeing Dr. Wilson on August 15, 2013. (Tr. 880-83). She complained of nervousness, depression and sleep problems. (Tr. 881). Dr. Wilson against adjusted plaintiff's medications due to lack of efficacy or insufficient improvement on her current regimen. (Tr. 883). Plaintiff's mental status examination findings were normal on October 10, 2013. (Tr. 1507-10). Dr. Wilson adjusted her medication. (Tr. 1507). On December 5, 2013, plaintiff's mental status examination findings were normal, but she complained of nervousness and sleep problems. (Tr. 1503-06). Dr. Wilson saw plaintiff on February 14, 2014 (Tr. 1499-1502) and March 13, 2014 (Tr. 1495-98). In March, she complained of sleep problems and he adjusted her medications for lack of efficacy or insufficient improvement. (Tr. 1498). Her mental status examination findings were normal. (Tr. 1497). On April 10, 2014, Dr. Wilson adjusted plaintiff's medications. (Tr. 1493-94). On July 17, 2014, plaintiff complained of

nervousness, depression and sleep problems and Dr. Wilson adjusted her medications for lack of efficacy or insufficient improvement. (Tr. 1487-90).

On October 3, 2014, Dr. Wilson noted that plaintiff was "still very needy and attention seeking," she had problems with sleeping and Dr. Wilson discussed increasing her Trazadone dose to help with this, and she reported increased mood swings, which he noted he would address by raising Invega.[4] (Tr. 1481-83). Her appearance was "fair groomed" and her speech was normal; her thought process and content was linear and oriented x three; she denied auditory and visual hallucinations; her mood/affect was "ok with congruent affect"; she denied suicidal/homicidal ideation; her behavior was within normal limits; her cognition was baseline; and her insight/judgment was "fair to poor/fair." (Tr. 1481). Dr. Wilson increased her Invega. (Tr. 1482). On November 21, 2014, Dr. Wilson again increased Invega as well as Buspar. (Tr. 1478-80).

### b. Dr. Wilson's June 27, 2013 assessment

After he had treated plaintiff for six months, Dr. Wilson completed a "Mental Impairment Questionnaire (RFC & Listings)" on June 27, 2013. (Tr. 872-78). He reported he had seen plaintiff from December 13, 2012 to May 23, 2013. (Tr. 873). He listed plaintiff's diagnoses as Bipolar, depressed with psychosis, PTSD, and borderline personality disorder. He assigned her a GAF (Global Assessment of Functioning) score of 46 and reported her highest GAF in the past

---

[4] Dr. Wilson's treatment notes as of October 2014 are electronically transcribed.

year had been 50.[5] Her treatment included outpatient therapy, pharmacological management and case management. Her prescribed medications were Invega Sustenna, Trazadone 200, and Clonazapam. Previous medications included Buspar, Depakote, Seroquel, Lexapro, Topamax, Tegretol and Ambien. Side effects included weight gain from Depakote and Seroquel and excessive sleeping previously, but Dr. Wilson noted now she was not sleeping more than six hours a night.

Dr. Wilson listed clinical findings of "problems with short term memory, anxiety, [and] self-expression. She is very fearful in public setting [and] has ongoing suicidal ideation [and] some auditory hallucinations." (Tr. 873). Dr. Wilson opined that plaintiff's prognosis was "Poor. Client has not shown much improvement in anxiety. Symptoms even on medications. Voices have improved somewhat." (Id.). Dr. Wilson identified the following signs and symptoms: "Anhedonia or pervasive loss of interest in almost all activities; Decreased energy; Thoughts of suicide; Feelings of guilt or worthlessness; Impairment in impulse control; Generalized persistent anxiety; Mood disturbance; Recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress; Paranoid thinking or inappropriate suspiciousness; Emotional withdrawal or isolation; Bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and currently characterized by either or both syndromes); Intense and unstable interpersonal

---

[5] A GAF score represents "the clinician's judgment of the individual's overall level of functioning." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed., text rev. 2000). The GAF score is taken from the GAF scale, which "is to be rated with respect only to psychological, social, and occupational functioning." Id. A GAF score of 41-50 indicates "serious symptoms." Id. at 34. An ALJ may, but is not required to, consider GAF scores as one factor in assessing a claimant's mental functioning. Miller v. Comm'r of Soc. Sec., 811 F.3d 825, 836 (6th Cir. 2016).

15

relationships and impulsive and damaging behavior; Perceptual or thinking disturbances; Hallucinations or delusions; Emotional lability; Deeply ingrained, maladaptive patterns of behavior; Vigilance and scanning; Pathologically inappropriate suspiciousness or hostility; Sleep disturbance; Recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror and sense of impending doom occurring on the average of at least once a week." (Tr. 874).

Dr. Wilson assessed plaintiff's mental abilities and aptitudes need to do unskilled work as follows: Her ability to carry out very short or simple instructions was unlimited or very good. (Tr. 875). She had limited but satisfactory ability to understand and remember very short and simple instructions, sustain an ordinary routine without special supervision, and be aware of normal hazards and take appropriate precautions. She was seriously limited, but not precluded, in her ability to remember work-like procedures, ask simple questions or request assistance, and respond appropriately to changes in a routine work setting. Plaintiff was unable to meet competitive standards in the categories of maintain regular attendance and be punctual within customary, usually strict tolerances, work in coordination with or proximity to others without being unduly distracted, make simple work-related decisions, complete a normal workday and workweek without interruptions from psychologically based symptoms, perform at a consistent pace without an unreasonable number and length of rest periods, accept instructions and respond appropriately to criticism from supervisors, get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes, and deal with normal work stress.

Dr. Wilson assessed plaintiff's abilities and aptitudes to do semiskilled and skilled work as follows: She was unable to meet competitive standards in the categories of understanding and

16

remembering detailed instructions, carrying out detailed instructions, and setting realistic goals or making plans independently of others. She was seriously limited but not precluded in her ability to deal with the stress of semiskilled and skilled work. She had limited but satisfactory in her ability to adhere to basic standards of neatness and cleanliness; she was seriously limited but not precluded in her ability to interact appropriately with the general public; and she was unable to meet competitive standards in the categories of maintaining socially appropriate behavior, traveling in an unfamiliar place, and using public transportation. (Tr. 876).

Dr. Wilson assessed plaintiff as having moderate restriction of activities of daily living; marked difficulties in maintaining social functioning; extreme difficulties in maintaining concentration, persistence or pace; and no episodes of decompensation of at least two weeks duration in a 12-month period. (Tr. 876).

Dr. Wilson opined that plaintiff had:

A. Medically documented history of a chronic organic mental, schizophrenic, etc., or affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do any basic work activity, with symptoms or signs currently attenuated by medication or psychosocial support, and . . .
. . . .

2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate.

. . . .

B. An anxiety related disorder and **complete** inability to function independently outside the area of one's home.

(Tr. 877). He opined that plaintiff's impairments or treatment would cause plaintiff to be absent from work more than four days per month, and her impairment had lasted or could be expected

17

to last at least 12 months. (Tr. 877). Dr. Wilson added that plaintiff "has had severe problems getting along with others; cursing [and] hitting. At this time, she is terrified of going anywhere alone." (Tr. 878). He opined that plaintiff could not manage benefits in her own interest.

####     *v. Dr. Cory Pelnick, M.D.*

#### *a. Treatment records*

Plaintiff began seeing Dr. Cory Pelnick, M.D., at Talbert House on January 20, 2015. (Tr. 1473-75). The notes reflect that plaintiff was living with her boyfriend and had four children. None of the children were living with her and she had contact with three of them. She had a history of "treatment resistant psychotic [symptoms]" and had generally been compliant with her medications and had tolerated most of them well, but she continued to have "significant problems." Her most recent medications were Trazadone, Lithium, Invega and a low dose of Seroquel with excellent effects on sleep and mood "but unclear" if any effect on auditory hallucinations, which "remain command at times." Plaintiff's sleep had been poor despite her medications. Her affect was calm but she was restless in her seat. She reportedly paced at home even when on medication. Dr. Pelnick adjusted plaintiff's medications by adding Seroquel and resuming "previously effective" Klonopin and decreasing other medications. (*Id.*). On March 2, 2015 plaintiff reported that Seroquel 200 mg had greatly increased her appetite. Her auditory/visual hallucinations remained problematic. Klonopin had lessened her anxiety somewhat during the day. Plaintiff's affect was constricted but reactive and her thoughts were concrete but logical. Dr. Pelnick adjusted her medications, including by adding Zyprexa with a plan to increase Lithium if needed. (Tr. 1473-74). On April 20, 2015, plaintiff reported Zyprexa was ineffective, and she felt the Seroquel dose needed to be increased because she was

still having significant racing thoughts at night and difficulty falling asleep. Lately, her auditory hallucinations had decreased significantly but she was "still having some [visual hallucinations]." Plaintiff showed overall improvement though she continued to have significant anxiety and ruminative thought patterns. Her medications were adjusted, with melatonin and Lexapro added. (Tr. 1470-71). On June 16, 2015, plaintiff reported she was doing "somewhat better" with the increase in Seroquel to 600 mg but she continued to feel dysphoric and ruminative and her sleep remained problematic, as it took her hours to fall asleep. Her affect was somewhat anxious but reactive, her thoughts were concrete but clear, auditory hallucinations were in the background but were not bothersome, and visual hallucinations had not been problematic lately. Her medications were increased. (Tr. 1467-68). On August 18, 2015, plaintiff reported more visual hallucinations lately and some increase in auditory hallucinations and her sleep remained interrupted, but she was feeling less depressed and was crying less since the Lexapro was increased. (Tr. 1464-66). On October 20, 2015, plaintiff reported that an increase in Seroquel to 800 mg had helped with sleep and auditory hallucinations were "somewhat better," but her sleep was still interrupted. Her auditory/visual hallucinations were clearly less intrusive and disturbing than in the past but still bothersome, especially visual hallucinations of "black smoke" that she saw in the periphery. (*Id.*). Her weight was increasing, for which Topamax was prescribed again. She reportedly was drinking up to two 2 liter bottles of Mountain Dew a day, and the plan was for her to switch to the diet version and try caffeine free later in the day. (Tr. 1462). On December 21, 2015, plaintiff reported that the addition of Topamax had been partially helpful. Her auditory/visual hallucinations were clearly decreased, the "smoke shadows" had lessened, her sleep remained interrupted but fair, and her weight was

going down slightly as she was drinking less soda and more high calorie juices. Dr. Pelnick encouraged her to drink water or diet drinks. Her mood was generally stable, she still had racing thoughts at night and anxiety, her affect was constricted but reactive, and her thoughts were concrete but clear. Dr. Pelnick increased the Topamax dose. (Tr. 1458-59).

### b. Dr. Pelnick's February 10, 2016 assessment

Dr. Pelnick and plaintiff's therapist at Centerpoint/Talbert House, Ms. Calkins, completed a Mental Impairment Questionnaire on February 10, 2016. (Tr. 1592-96). They reported that plaintiff had first been seen by the agency on May 20, 2010, Ms. Calkins had seen plaintiff on a biweekly or monthly basis since August 23, 2011, and Dr. Pelnick had seen plaintiff since January 20, 2015. (Tr. 1592). Plaintiff also received case management services. Her diagnoses were Schizoaffective Disorder, Borderline Personality Disorder, and Generalized Anxiety. They assigned her a current GAF score of 48 and reported the highest GAF score in the past year had been 50. They noted that plaintiff attended most appointments and reported medical compliance, but she had made "[l]ittle progress on dependency and anxiety issues." Her prescribed medications were Invega, Quetiapine Fumarate, Escitalopram Qxalate, and Topirimate, but Dr. Pelnick reported her mood and psychotic symptoms had been treatment-resistant and difficult to mitigate. The side effects of the medications as reported by plaintiff were dizziness, drowsiness and bladder control. The clinical findings as reported in the last physician's treatment note that demonstrated the severity of plaintiff's impairments and symptoms were stable mood, some racing thoughts and anxiety at night, affect constricted but reactive concrete thoughts, and some auditory and visual hallucinations. Plaintiff's prognosis was reported to be poor. (*Id.*).

Dr. Pelnick and Ms. Calkins assessed plaintiff's ability to perform work-related activity. (Tr. 1593-94). In the area of understanding and memory, they found moderately severe impairment in plaintiff's ability to understand and remember very short and simple instructions and severe impairment in plaintiff's ability to remember locations and work-like procedures and in the ability to understand and remember detailed instructions. (Tr. 1593). In the area of sustained concentration and persistence, they found moderately severe impairment in plaintiff's ability to carry out very short and simple instructions and severe impairment in the ability to carry out detailed instructions, maintain attention and concentration for extended periods, and perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances. In the area of social interaction, they found moderately severe impairment in plaintiff's ability to ask simple questions or request assistance and severe impairment in the ability to interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors, get along with coworkers or peers without distracting them or exhibiting behavioral extremes, and maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness. (Tr. 1594). They found moderately severe impairment in plaintiff's ability to be aware of normal hazards and take appropriate precautions and severe impairment in her ability to respond appropriately to changes in the work setting, travel in unfamiliar places or use public transportation, and set realistic goals or make plans independently of others. Dr. Pelnick and Ms. Calkins found moderately severe restriction of activities of daily living, severe difficulties in maintaining social functioning, and severe difficulties in maintaining concentration, persistence or pace, and she had experienced no episodes of decompensations of at least two weeks duration within a 12-month period. The

assessment describes her baselines as a "loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence or pace" because plaintiff "has no social relationships except her boyfriend [and] can't cook or clean for herself." (*Id.*). The assessment notes that there are no intellectual functioning test results but plaintiff is "unable to complete simple homework for therapy [and] has to have everything explained to her in session – slowly [and] several times." (Tr. 1595). Dr. Pelnick and Ms. Calkins anticipated that plaintiff would miss more than four days of work per month due to her impairments or treatment and that she could not manage funds in her own best interest. They added that plaintiff "has [a] history of angry outbursts, walking off jobs, fighting with supervisors, not dealing well with customers . . . and high anxiety in public. She can't remember appointments or follow directions as evidenced by behaviors in sessions here." (Tr. 1596).

## 2. First assignment of error: Weight to the treating physicians' opinions

Plaintiff alleges as her first assignment of error that the ALJ erred by failing to properly weigh the opinion of her three treating psychiatrists, Drs. Weech, Wilson, and Pelnick, who treated plaintiff over the course of approximately five years and issued relatively consistent opinions assessing debilitating limitations. (Docs. 13, 20). Plaintiff alleges that the treating psychiatrists' opinions are supported by mental status examination findings; the frequent medication changes reflected in the treatment records, which are consistent with ongoing and uncontrolled symptoms; and the GAF scores, which the ALJ discounted based on their subjective nature and dependence on plaintiff's self-reports. Plaintiff alleges that the treating physicians' opinions are consistent with the record as a whole, which evidences fluctuating and uncontrolled

psychological symptoms. Plaintiff argues that the ALJ erred by failing to credit the opinions of the treating psychiatrists and instead giving "some weight" to the opinions of the nonexamining state agency psychologists, who each reviewed less than 40 pages of the 700-plus pages of medical evidence approximately four years before the most recent hearing date. (Doc. 13 at 12, citing Tr. 787, 822).

### i. *Treating physician doctrine*

It is well-established that the findings and opinions of treating physicians are entitled to substantial weight. "In general, the opinions of treating physicians are accorded greater weight than those of physicians who examine claimants only once." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529-30 (6th Cir. 1997). *See also Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985) ("The medical opinions and diagnoses of treating physicians are generally accorded substantial deference, and if the opinions are uncontradicted, complete deference."). "The treating physician doctrine is based on the assumption that a medical professional who has dealt with a claimant and his maladies over a long period of time will have a deeper insight into the medical condition of the claimant than will a person who has examined a claimant but once, or who has only seen the claimant's medical records." *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994).

"Treating-source opinions must be given 'controlling weight' if two conditions are met: (1) the opinion 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques'; and (2) the opinion 'is not inconsistent with the other substantial evidence in [the] case record.'" *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (citing 20 C.F.R. § 404.1527(c)(2)). *See also Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011). If the ALJ

declines to give a treating source's opinion controlling weight, the ALJ must balance the factors set forth in 20 C.F.R. §§ 404.1527(c)(2)-(6), 416.927(c)(2)-(6) in determining what weight to give the opinion. *See Gayheart*, 710 F.3d at 376; *Wilson*, 378 F.3d at 544. These factors include the length, nature and extent of the treatment relationship and the frequency of examination. 20 C.F.R. § 416.927(c)(i)-(ii); *Wilson*, 378 F.3d at 544. In addition, the ALJ must consider the medical specialty of the source, how well-supported by evidence the opinion is, how consistent the opinion is with the record as a whole, and other factors which tend to support or contradict the opinion. 20 C.F.R. § 416.927(c)(3)-(6); *Gayheart*, 710 F.3d at 376; *Wilson*, 378 F.3d at 544.

"Importantly, the Commissioner imposes on its decision makers a clear duty to 'always give good reasons in [the] notice of determination or decision for the weight [given a] treating source's opinion.'" *Cole*, 661 F.3d at 937 (citation omitted). *See also Wilson*, 378 F.3d at 544 (ALJ must give "good reasons" for the ultimate weight afforded the treating physician opinion). Those reasons must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Cole*, 661 F.3d at 937. This procedural requirement "ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule." *Gayheart*, 710 F.3d at 376 (quoting *Wilson*, 378 F.3d at 544).

In the psychiatric context, objective medical evidence consists of laboratory findings and medical signs, 20 C.F.R. § 416.912(b), which are defined under 20 C.F.R. § 416.928(b) as "psychological abnormalities which can be observed, apart from your statements (symptoms)"

and which "must be shown by medically acceptable clinical diagnostic techniques."[6] *Parr v. Colvin*, No. 1:13-cv-31, 2014 WL 301043, at *6, n.1 (S.D. Ohio Jan. 28, 2014) (Report and Recommendation), *adopted sub nom. Parr v. Comm'r of Soc. Sec.*, 2014 WL 656774 (S.D. Ohio Feb. 19, 2014). "[S]igns are medically demonstrable phenomena that indicate specific psychological abnormalities, e.g., abnormalities of behavior, mood, thought, memory, orientation, development, or perception," which must "be shown by observable facts that can be medically described and evaluated." 20 C.F.R. § 416.928(b); *Parr*, 2014 WL 301043, at *6, n.1. "When mental illness is the basis of a disability claim, clinical and laboratory data may consist of the diagnosis and observations of professionals trained in the field of psychopathology," whose findings should not be rejected simply because of the "relative imprecision of the psychiatric methodology."[7] *Parr*, 2014 WL 301043, at *6. Thus, in *Parr*, treatment notes which included clinical findings such as "labile mood, mood swings, panicked mood, psychomotor retardation, decreased appetite, poor sleep, poor concentration, tearful, anxiety, [and] agoraphobia," and which showed that the plaintiff's medications were often changed in an effort to make them more effective, were found to provide ample objective evidence and clinical findings related to the plaintiff's mental impairments. *Id.* (citing *Blankenship v. Bowen*, 874 F.2d 1116, 1121 (6th Cir. 1989)).

---

[6] Sections 416.912(b) and 416.928(b) were modified effective March 17, 2017. The prior regulations were in effect when the ALJ issued his decision in this case and apply here.

[7] Defendants cite two cases for the proposition that an ALJ is not required to credit a treating physician's medical opinion to the extent it is based on the claimant's subjective self-reports. (Doc. 17 at 3-4, citing *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 156 (6th Cir. 2009); *McCoy v. Chater*, 81 F.3d 44, 47 (6th Cir. 1995). Those cases are distinguishable on their facts from this case and do not apply here because they both involved physical impairments.

*ii. The ALJ's treating physician analysis*

In her decision in this case, the ALJ gave "some weight" to the assessments of the nonexamining state agency psychologists. (Tr. 30). Dr. Cynthia Waggoner, Psy.D., reviewed the record in May 2012 and assessed mild restriction of activities of daily living, mild difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence or pace. (Tr. 151-63). She opined that plaintiff is limited to simple, routine tasks in an environment that has flexible production standards and schedules and that she is able to interact superficially with the general public, co-workers and supervisors. (Tr. 160). The ALJ found there were some "internal inconsistencies as to the B criteria" and that the overall record reflected that plaintiff is generally more limited than Dr. Waggoner determined; in particular, she has moderate social limitations. (Tr. 30). However, the ALJ agreed with Dr. Waggoner's assessment of "no more than moderate limitations." (*Id.*). Dr. Frank Orosz, Ph.D., modified Dr. Waggoner's findings on reconsideration of her assessment in September 2012 by assessing moderate restriction of activities of daily living and social functioning and adding a limitation to work tasks that are not fast paced or strictly demanding to account for lower stress tolerance resulting from plaintiff's symptoms of anxiety and depression. (Tr. 185-89). The ALJ accorded Dr. Orosz's assessment "some weight" on the grounds he has program knowledge and his limitations were "reasonably well supported" by the objective medical evidence overall; however, the ALJ included "somewhat different functional limitations" in the RFC so as to "better quantify the nature of certain limitations" and to provide time restrictions. (Tr. 30-31).

The ALJ declined to give controlling weight to the opinions of plaintiff's three treating psychiatrists, Drs. Weech, Wilson and Pelnick. (Tr. 31-33). First, the ALJ considered Dr.

Pelnick's opinions, including those he gave in the Mental Impairment Questionnaire dated February 10, 2016, that plaintiff has moderately severe to severe limitations in understanding and memory, sustained concentration and persistence, social interactions, and adaptations; moderately severe restrictions of activities of daily living; and severe difficulties in maintaining social functioning as well as concentration, persistence or pace; she has experienced four or more episodes of decompensation within a 12-month period, each of at least 2-weeks duration, but apparently when not on medications; and she was expected to be absent from work more than four days per month. (Tr. 31, citing Tr. 992-94, 1591-96). The ALJ found that the limitations of missing work at least four days per month and the moderately severe to severe limitations Dr. Pelnick assessed were not well-supported by (1) the signs and findings in Dr. Pelnick's records, or (2) the totality of the medical evidence. The ALJ determined that Dr. Pelnick's opinions were "somewhat inconsistent" with his own treatment notes, and specifically a treatment note dated November 21, 2014, showing that plaintiff had linear thought processes, fair grooming, and normal speech; she was oriented x3; she denied hallucinations; her behavior was within normal limits; her cognition was baseline; her insight and judgment were fair; and her mood was "okay" and congruent with affect.[8] (Tr. 31, citing Tr. 1457-1533). The ALJ generally found that Dr. Pelnick recorded similar findings or noted unchanged examination results on other dates. (*Id.*, citing Tr. 1457-1533). The ALJ also determined that Dr. Pelnick's opinions were inconsistent with other evidence of record consisting of (1) the mental health treatment records, which "reflect some transient complaints" but "generally reflect benign findings" (Tr. 792, 797, 879-

---

[8] The only treatment notes of record dated November 21, 2014, appear to be notes generated by Dr. Wilson. (*See* Tr. 1478-80).

914, 1276-98, 1299-1342, 1343-1456, 1534-1590); and (2) emergency room records dated May 18, 2014 (Tr. 937-60), which document normal mental status examination findings and show that plaintiff's presenting complaints of suicidal ideation and hallucinations changed when she was advised that a hospitalization might help or hurt her disability claim. (Tr. 31, citing Tr. 944, 943).

Second, the ALJ considered Dr. Weech's opinion dated August 14, 2012, that plaintiff has "very poor ability to tolerate stress, difficulty working with others and getting along with supervisors, very poor frustration tolerance [and] difficulty concentrating and complet[ing] tasks." (Tr. 32, citing Tr. 822-24). The ALJ determined that Dr. Weech's opinion was not entitled to controlling weight and gave it "limited weight" on the ground the limitations Dr. Weech assessed were not well-supported by "the totality of the medical evidence or signs and findings reported in Dr. Weech's records." (Tr. 32). The ALJ also found that "the activities of daily living, treatment history, and mental status findings discussed above are not consistent with Dr. Weech's opinions" because although "the mental health treatment records reflect various complaints . . . the totality of the treatment notes generally reflect benign findings that are not consistent with disabling mental impairments." (Tr. 32, citing Tr. 792, 797, 879-914, 937-60, 1276-98, 1299-1342, 1343-1456, 1534-1590).

The ALJ also gave less than controlling weight and only "some weight" to the opinion of treating psychiatrist Dr. Wilson that plaintiff "is unable to meet competitive standards in multiple abilities and aptitudes needed to do unskilled, semiskilled and skilled work"; that she is "seriously limited, but not precluded in multiple mental abilities and aptitudes needed to do unskilled, semiskilled, and skilled work"; that she has "marked difficulties in maintaining social

28

functioning and extreme difficulties in maintaining concentration, persistence, or pace"; that she would be absent from work more than four days per month; and that her current GAF score was 46 and her highest GAF score over the past year had been 50.[9] (Tr. 32, citing Tr. 872-78). The ALJ found that Dr. Wilson's opinion was not supported by (1) significant signs or findings in Dr. Wilson's treatment notes, or (2) other evidence in the record documenting signs, findings, or treatment, or limitations in activities of daily living, that are consistent with the severity of the limitations Dr. Wilson reported and specifically with the limitation of missing work at least four days per month. (Tr. 32). The ALJ also found that: (1) "the totality of the treatment notes generally reflect benign findings that are not consistent with disabling mental impairments" (Tr. 32-33, citing Tr. 792, 797, 879-914, 937-60, 1276-98, 1299-1342, 1343-1456, 1534-1590); and (2) review of all the other factors the ALJ discussed did not support the restrictive limitations Dr. Wilson assessed, particularly in light of plaintiff's "documented focus on obtaining disability benefits," as discussed in connection with the ALJ's moderate findings as to the "B" criteria. (Tr. 32-33).

### iii. The ALJ's analysis is not substantially supported

The ALJ's determination under the first prong of the controlling weight analysis – whether the opinion was "well-supported by medically acceptable clinical and laboratory diagnostic techniques" – is not substantially supported as to any of the treating psychiatrist's assessments in this case. *See Gayheart*, 710 F.3d at 376. As to the assessments of Drs. Weech and Wilson, the ALJ made only conclusory findings that this prong of the controlling weight standard was not satisfied. The ALJ determined that "Dr. Weech's opinions were not well

---

[9] The ALJ gave "little" weight to any of the GAF scores in the record. (Tr. 33).

supported by the . . . signs and findings reported in Dr. Weech's records." (Tr. 32). The ALJ

did not explain this finding or cite any specific records to support it. Similarly, the ALJ found

that "the record does not reflect significant signs or findings in treatment notes from Dr. Wilson

to support the severity of the limitations that he reported," and that the limitation for missing

work four days or more each month was not well-supported by "signs and findings reported in

Dr. Wilson's records." (*Id.*). The ALJ failed to provide any explanation for this sweeping

statement in her decision to show how signs and findings in Dr. Wilson's treatment records fail

to support Dr. Wilson's opinions. The ALJ's failure to adequately explain the reasons for the

weight given a treating physician's opinion "*denotes a lack of substantial evidence*, even where

the conclusion of the ALJ may be justified based upon the record." *Blakley v. Comm'r of Social

Sec.*, 581 F.3d 399, 407 (6th Cir. 2009) (emphasis in the original) (quoting *Rogers v. Comm'r of

Soc. Sec.*, 486 F.3d 234, 243 (6th Cir. 2007)). *See also Karger v. Comm'r of Soc. Sec.*, 414 F.

App'x 739, 753 (6th Cir. 2011) ("[I]t is not enough to dismiss a treating physician's opinion as

'incompatible' with other evidence of record; *there must be some effort to* identify the specific

discrepancies and to *explain why it is the treating physician's conclusion that gets the short end

of the stick.*") (quoting *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 552 (6th Cir. 2010)

(emphasis in the original)). Accordingly, the ALJ's finding on the first prong of the controlling

weight standard is not substantially supported with respect to the assessments of Drs. Weech and

Wilson.

Further, although the ALJ provided limited support for her finding that Dr. Pelnick's

opinion was "somewhat inconsistent" with his treatment notes, this finding also fails to satisfy

the first prong of the controlling weight standard. In making this finding, the ALJ relied on a

portion of the treatment notes generated by plaintiff's treating psychiatrists at Centerpoint/ Talbert House, specifically: (1) a treatment record from Dr. Wilson dated November 21, 2014 that reflected essentially normal mental status examination findings (Tr. 1478-80), and (2) treatment records dated April 2013 to December 2015 (1475-1533). (Tr. 31). The ALJ did not reference any other treatment notes generated prior to Dr. Pelnick's assessment, including Dr. Weech's treatment notes, and did not mention Ms. Calkins' therapy notes. Thus, it is impossible to discern whether the ALJ rejected this information as having no probative value or whether the ALJ simply ignored this medical evidence. *Price v. Commr. of Soc. Sec.*, No. 1:13-cv-665, 2014 WL 7272206, at *7 (S.D. Ohio Dec. 18, 2014) (citing *Morris v. Sec'y of Health & Human Servs.*, No. 86-5875, 1988 WL 34109, at *2 (6th Cir. Apr.18, 1988) (when an ALJ fails to mention relevant evidence in his decision, "the reviewing court cannot tell if significant probative evidence was not credited or simply ignored.") (quoting *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981)). The ALJ's omission was not harmless because each of the treating providers at Centerpoint/Talbert House practiced at the same agency and provided counseling and psychiatric care to plaintiff as part of a "continuum of care." *Id.* (the ALJ's failure to consider progress notes prepared by the licensed social worker over a more than 18-month period in weighing treating psychiatrist's medical opinion was not harmless given that the social worker and psychiatrist were "part of the same practice and provided counseling and psychiatric care to plaintiff as part of a 'continuum of care.'") (citing *Guyaux v. Comm'r of Soc. Sec.*, No. 13-12076, 2014 WL 4197353, at *16 (E.D. Mich. Aug. 22, 2014)). Thus, because the ALJ did not consider the totality of the relevant treatment records in assessing whether Dr. Pelnick's opinion was supported by his objective findings, the ALJ's determination that the first prong of the

controlling weight analysis is not satisfied as to Dr. Pelnick's assessment is not substantially supported.

The ALJ did generally cite to mental health treatment notes generated by all of the treating psychiatrists and mental health therapist Ms. Calkins in finding that each of the treating physicians' opinions was not consistent with the other evidence of record. (*See* Tr. 31, 32, 33, citing, e.g., Tr. 792, 797, 879-914, 1276-98, 1299-1342, 1343-1456, 1543-90).[10] In weighing each of the treating psychiatrists' opinions, the ALJ determined that the mental health treatment notes were inconsistent with the psychiatrist's assessment because the notes reflected only "some transient complaints" and generally disclosed "benign findings" that are not consistent with the disabling mental impairments. (Tr. 31, 32, 33). However, as explained *infra*, the treatment records contradict the ALJ's finding. The records disclose that plaintiff suffered from unremitting and uncontrolled mental health symptoms that are documented by the treating providers' objective and clinical findings, plaintiff's subjective complaints as reported to her mental health providers, and repeated medication changes made in an effort to improve the efficacy of plaintiff's medications. The evidence thus demonstrates that the ALJ's finding on the second prong of the controlling weight analysis – whether the opinion "'is not inconsistent with the other substantial evidence in [the] case record,'" – and the ALJ's decision to give those opinions "little" or "some" weight based on inconsistency with the record as a whole is not substantially supported as to each of the treating psychiatrist's assessments. *See Gayheart*, 710 F.3d at 376; 20 C.F.R. § 416.927(c)(2)).

_____

[10] Tr. 792 and 797 are part of the Centerpoint Health Diagnostic Assessment Form dated August 23, 2011. (Exh. 11F/6, 11).

The treating providers' records document plaintiff's complaints of symptoms as early as August 2011, when plaintiff complained of depression, suicidal thoughts with no plan, daily crying spells, feeling hopeless and helpless, a lack of motivation and energy, anxiety and nervousness, periods of impulsiveness and racing thoughts, paranoia, mood changes, hypervigilance, difficulty trusting people, a short temper, and social isolation, and reported that she did not associate with people except for her boyfriend and children. On mental status examination, her behavior was cooperative but guarded, her impulse control was fair, her facial expression was attentive/sad, she reported paranoid ideation and mild suicide ideation and perceptual disturbances/auditory hallucinations, her affect was blunted, her judgment was fair, and her mood was depressed/anxious. She had been on several medications for bipolar disorder and depression which had to be discontinued due to her pregnancy. (Tr. 793).

Treatment notes generated by the treating psychiatrists and plaintiff's mental health therapist during plaintiff's subsequent course of treatment repeatedly document abnormal objective findings and clinical signs of continued mental health symptoms. *See*, e.g., Tr. 814-15, 3/2012- plaintiff teared up when reporting she had no family support, she lacked energy, and she needed something to calm her down; Tr. 837, 10/2012- mood was flat/anxious, plaintiff was tearful; Tr. 833, 12/2012- plaintiff's mood was angry/irritable and she reported together with her boyfriend that she had been hitting him; Tr. 829, 4/2013- mood was depressed, plaintiff became tearful when the therapist explained why the doctor had "streamlined" her medication; Tr. 1394, 5/2013- mood was anxious/depressed; Tr. 1393, 6/2013- mood was anxious/depressed, affect was constricted; Tr. 890, 6/2013- mood/affect were "anxious/mildly flattened"; Tr. 886, 7/2013- mood/affect were "anxious/mildly flattened"; Tr. 1387, 10/2013- mood was depressed; Tr. 1385,

12/2013- mood was anxious; Tr. 1382, 3/2014- mood was angry and irritable; Tr. 1381, 4/2014- affect was constricted, mood was depressed; Tr. 1379, 5/2014- mood was depressed, affect was flat; Tr. 1377- 7/2014, mood was depressed; Tr. 1376, 8/2014- mood was depressed; Tr. 1371, 10/2014- mood/affect was angry, irritable, depressed, behavior/functioning was tearful at times; Tr. 1364, 1/2015- mood/affect was anxious, behavior/functioning was hesitant, helpless, dependent; Tr. 1473-74, 3/2015- affect was constricted but reactive, thoughts were concrete but logical; Tr. 1467, 6/2015- affect was somewhat anxious but reactive, thoughts were concrete but clear; Tr. 1355, 6/2015- mood was depressed/anxious, thought process was concrete; Tr. 1351, 7/2015- thought process/orientation was concrete and mood/affect was anxious; Tr. 1349, 8/2015- mood/affect was blunted and low energy, thought process/orientation was notable for racing thoughts/voices, behavior/functioning was notable for low motivations and energy; Tr. 1458, 12/2015- affect was constricted but reactive, thoughts were concrete but clear).

Further, the treatment notes document that plaintiff continued to complain throughout the course of her treatment of symptoms like those she reported in August 2011, including depressed mood (Tr. 830, 837, 840, 888-89, 884-85, 1301, 1394), crying spells (Tr. 814, 884), auditory/visual hallucinations (Tr. 886, 1461, 1464, 1473), anxiety (Tr. 814, 1301, 1394, 1458, 1470), ruminative or racing thoughts (Tr. 886, 1371, 1458, 1467, 1470), and anger and violent behavior (Tr. 833, 884). The treating psychiatrists frequently changed plaintiff's medications in an effort to mitigate her symptoms. (*See* Tr. 817, 2/2012; Tr. 895, 5/2012; Tr. 851, 7/2012; Tr. 846, 7/2012; Tr. 841, 9/2012; Tr. 838, 10/2012; Tr. 832, 12/2012; Tr. 899, 4/2013; Tr. 883, 8/2013; Tr. 1498, 3/2014; Tr. 1478-80, 11/2014; Tr. 1470-71, 4/2015; Tr. 1467-68, 6/2015). Plaintiff's psychiatrists reported that despite her general compliance with her medications, she

continued to experience significant mental health issues. Dr. Pelnick reported in January 2015 that plaintiff had a history of "treatment resistant psychotic [symptoms]" and though she had generally been compliant with her medications, she continued to have "significant problems." (Tr. 1474).

Thus, contrary to the ALJ's finding, the treatment records generated by plaintiff's three treating psychiatrists and mental health therapist at Centerpoint/Talbert House over the course of more than four years of treatment do not reflect only "some transient symptoms" or generally "benign findings." (Tr. 31, 32, 33). Rather, read as a whole, these records document persistent abnormal mental health findings and treatment resistant symptoms. As such, the mental health records appear to support each of the treating psychiatrist's assessments. *See Parr v. Colvin*, No. 1:13-cv-31, 2014 WL 301043, at *6, n.1 (S.D. Ohio Jan. 28, 2014) (Report and Recommendation), *adopted sub nom. Parr v. Comm'r of Soc. Sec.*, 2014 WL 656774 (S.D. Ohio Feb. 19, 2014) (treatment notes which included clinical findings such as "labile mood, mood swings, panicked mood, psychomotor retardation, decreased appetite, poor sleep, poor concentration, tearful, anxiety, agoraphobia," and which showed that the plaintiff's medications were often changed in an effort to make them more effective, provided ample objective evidence and clinical findings related to the plaintiff's mental impairments). It is not clear whether the ALJ considered these findings and rejected them as lacking probative value or whether the ALJ ignored the findings. *Price*, 2014 WL 7272206, at *7. Because the records appear to substantiate plaintiff's complaints of debilitating symptoms and functional limitations, the ALJ's failure to address the substantiating findings was not harmless. The ALJ's finding that the

35

psychiatrists' opinions are not consistent with the mental health treatment notes is not substantially supported.

The ALJ also referenced plaintiff's "treatment history," plaintiff's daily activities, and plaintiff's focus on obtaining disability benefits in finding that the assessments of Dr. Weech and Dr. Wilson were inconsistent with the record as a whole. (Tr. 32). The ALJ did not explain what aspects of plaintiff's treatment history could not be reconciled with the opinions. Simply referring to plaintiff's treatment history is not sufficient. *See Karger,* 414 F. App'x at 753 (the ALJ must make some effort to identify and explain the specific discrepancies). Further, the ALJ's decision is not substantially supported insofar as the ALJ relied on plaintiff's daily activities to discount Drs. Weech and Wilson's assessments as inconsistent with the record as a whole. The ALJ did not explain how the daily activities that she identified - maintaining personal care, preparing meals daily, cleaning around the house three or four days each week, cooking with a gas oven or stove top, making a grocery list, using a cell phone to call and text family, and doing laundry once a month at a facility – are inconsistent with the treating psychiatrists' assessments. (Tr. 29; *see* Tr. 25; Tr. 500-07, Hearing Testimony). Nor does it appear that an ability to perform these activities is inconsistent with the severe mental impairments and symptoms and debilitating functional limitations that the treating psychiatrists assessed. It was not enough for the ALJ to give the treating psychiatrists' opinions reduced weight on this basis without explaining the perceived inconsistency between plaintiff's daily activities and their opinions. *See Karger,* 414 F. App'x 739. Similarly, although the ALJ relied on plaintiff's "focus" on obtaining disability benefits as support for her decision to discount Dr. Wilson's opinion, a desire to obtain disability benefits is not sufficient evidence in and of itself

to support the decision to give reduced weight to a treating provider's assessment. *See Woodcock v. Comm'r of Soc. Sec.*, 201 F. Supp.3d 912, 922-23 (S.D. Ohio 2016) ("Certainly most, if not all, Social Security claimants desire to win their disability cases, particularly those in dire financial situations like Plaintiff - who was without a home, food, or transportation for periods of time."). The ALJ made no effort to explain why plaintiff's "focus" on obtaining disability benefits undermined the validity of Dr. Wilson's opinion.

Thus, the ALJ gave conclusory or unsupported reasons for finding the treating psychiatrists' assessments were unsupported by their own findings and the ALJ failed to consider the totality of the treatment records in making this finding. In addition, the ALJ failed to provide an explanation of the factors or evidence that she relied on to find the treating psychiatrists' assessments were not consistent with the record as a whole, and she inexplicably failed to specifically address evidence provided by the treating psychiatrists and plaintiff's mental health therapist. The ALJ's decision to give less than controlling weight to the assessments of plaintiff's three treating psychiatrists, which appear to be largely consistent with each other, is not substantially supported.

If the ALJ declines to give a treating source's opinion controlling weight, the ALJ must balance the factors set forth in 20 C.F.R. § 416.927(c)(2)-(6) in determining what weight to give the opinion. *See Gayheart*, 710 F.3d at 376; *Wilson*, 378 F.3d at 544. These factors include the length, nature and extent of the treatment relationship and the frequency of examination. 20 C.F.R. § 416.927(c)(i)-(ii); *Wilson*, 378 F.3d at 544. In addition, the ALJ must consider the medical specialty of the source, how well-supported by evidence the opinion is, how consistent

the opinion is with the record as a whole, and other factors which tend to support or contradict the opinion. 20 C.F.R. § 416.927(c)(3)-(6); *Gayheart*, 710 F.3d at 376; *Wilson*, 378 F.3d at 544.

The ALJ erred by failing to give good reasons that are "supported by the evidence in the case record, and [] sufficiently specific to make clear to any subsequent reviewers . . . the reasons" for the weight the ALJ gave the treating psychiatrists' opinions. *See Cole*, 661 F.3d at 937. The ALJ stated that in giving each treating psychiatrist's opinion less than controlling weight and only "limited" or "some" weight, she considered the physician's specialization, his explanation for the opinion, and consistency with the record as a whole. (Tr. 31, 32, 33). For the reasons discussed above, the ALJ's findings that the opinions are not consistent with the record as a whole are not substantially supported. Nor are the ALJ's additional reasons for giving the treating doctors' assessments' reduced weight. The ALJ did not state what consideration she gave the psychiatrists' specializations or explanations for their opinions, and neither did the ALJ explain how either of those considerations factored into the weighing decision. Further, the ALJ did not point to any inconsistencies between a psychiatrist's opinion and the explanation he gave for it. In addition, the ALJ gave no indication that she took the nature and length of the treatment relationship into account for any of the treating psychiatrists. The ALJ stated she took plaintiff's treatment history into account when assessing only Dr. Weech's assessment, but the ALJ simply mentioned this factor and did not elaborate further.

### iv. *Conclusion*

The record discloses that plaintiff suffered from unremitting and uncontrolled mental health symptoms that are documented by the treating mental health providers' objective clinical findings, plaintiff's subjective complaints as reported to her mental health providers, and

38

repeated efforts by the treating psychiatrists to improve the efficacy of plaintiff's medications and ameliorate the side effects. The ALJ did not give valid reasons that are substantially supported by the evidence for giving the treating psychiatrists' opinions less than controlling weight. Nor did the ALJ give good reasons that are substantially supported by the evidence of record for giving "limited" or "some" weight to each of the treating psychiatrists' assessments, which appear to be largely consistent with one another and with the treatment records of plaintiff's long-term treating mental health therapist. Plaintiff's first assignment of error should be sustained.[11]

## III. Conclusion

This matter should be remanded for an award of benefits. "[A]ll essential factual issues have been resolved and the record adequately establishes . . . plaintiff's entitlement to benefits." *Faucher v. Sec. of H.H.S.*, 17 F.3d 171, 176 (6th Cir. 1994). *See also Abbott v. Sullivan*, 905 F.2d 918, 927 (6th Cir. 1990); *Varley v. Sec. of H.H.S.,* 820 F.2d 777, 782 (6th Cir. 1987). The vocational expert testified that if the functional capacity assessments of treating psychiatrists Wilson and Pelnick are credited, those limitations would be inconsistent with competitive work or the expectations of employers under current work standards. (Tr. 85). As explained above, those assessments are consistent with Dr. Weech's assessment and the clinical and objective findings of record. In view of this vocational evidence, as well as the evidence outlined above, the proof of disability is strong and opposing evidence is lacking in substance. A remand in this matter would merely involve the presentation of cumulative evidence and would serve no useful

---

[11] As the undersigned recommends that this matter be reversed and remanded for an award of benefits, the Court need not reach plaintiff's second assignment of error.

purpose. *Faucher*, 17 F.3d at 176. *See also Felisky v. Bowen*, 35 F.3d 1027, 1041 (6th Cir. 1994). Accordingly, this matter should be reversed and remanded for an award of benefits.

## IT IS THEREFORE RECOMMENDED THAT:

The ALJ's decision be **REVERSED** pursuant to Sentence Four of 42 U.S.C. § 405(g) and **REMANDED** for an immediate award of benefits.

Date: 2/5/2018

Karen L. Litkovitz
United States Magistrate Judge

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

CINDY M. SMITH,
Plaintiff,

Case No. 1:17-cv-049

Black, J.

Litkovitz, M.J.

vs.

COMMISSIONER OF
SOCIAL SECURITY,
Defendant.

## NOTICE

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of

the recommended disposition, a party may serve and file specific written objections to the

proposed findings and recommendations. This period may be extended further by the Court on

timely motion for an extension. Such objections shall specify the portions of the Report objected

to and shall be accompanied by a memorandum of law in support of the objections. If the Report

and Recommendation is based in whole or in part upon matters occurring on the record at an oral

hearing, the objecting party shall promptly arrange for the transcription of the record, or such

portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the

assigned District Judge otherwise directs. A party may respond to another party's objections

**WITHIN 14 DAYS** after being served with a copy thereof. Failure to make objections in

accordance with this procedure may forfeit rights on appeal. *See Thomas* v. *Arn,* 474 U.S. 140

(1985); *United States* v. *Walters,* 638 F.2d 947 (6th Cir. 1981).